**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | No. 3:07cr120(MRK) |
| | : | |
| GWAYNE FISHER | : | |

**MEMORANDUM OF DECISION**

On May 16, 2008, following a three-day trial, a jury found Defendant Gwayne Fisher guilty

on all three counts of a Superseding Indictment: conspiracy to possess with the intent to distribute,

and to distribute, 500 grams or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)

and 846 (Count One); possession with intent to distribute 500 grams or more of cocaine in violation

of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) (Count Two); and use of a telephone to facilitate a drug

trafficking felony in violation of 21 U.S.C. § 843(b) (Count Three).[1]   Mr. Fisher has moved for

judgment of acquittal under Rule 29 of the *Federal Rules of Criminal Procedure*, or in the

alternative for a  new trial under Rule 33.  *See* Defendant Gwayne Fisher's Rule 29(c) Motion for

Judgment of Acquittal and Rule 33 Motion for a New Trial [doc. # # 206, 207].  For the reasons that

follow, the Court DENIES Mr. Fisher's Motion for Judgment of Acquittal and Motion for a New

Trial.

**I.**

"'It is well settled that a defendant seeking to overturn a conviction based upon insufficiency

of the evidence bears a heavy burden.'" *United States v. Morgan*, 385 F.3d 196, 204 (2d Cir. 2004)

---

[1] Mr. Fisher was tried together with Defendant Nicholas Rojas, *United States v. Rojas,* No. 3:06cr269(MRK), who was also convicted of a conspiracy and other charges.  Mr. Rojas also moves for a judgment of acquittal and for a new trial.  The Court has docketed today its decision regarding Mr. Rojas.

(quoting *United States v. Martinez*, 54 F.3d 1040,1042 (2d Cir. 1995) (internal citation and quotation marks omitted)). "Not only must the evidence be viewed in the light most favorable to the government and all permissible inferences drawn in its favor," *id.*, the conviction must be affirmed if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see United States v. Hardwick*, 523 F.3d 94, 100 (2d Cir. 2008). The Court must consider the Government's case "in its totality rather than in its parts, and may be satisfied by circumstantial evidence alone." *United States v. Hawkins*, 547 F.3d 66, 70-71 (2d Cir. 2008). As the Second Circuit has instructed:

> While a conviction based on speculation and surmise alone cannot stand, the jury's verdict may be based entirely on circumstantial evidence, and may be inferred from the evidence. So long as the inference is reasonable, it is the task of the jury, not the court, to choose among competing inferences. Thus, where either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter.

*United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008) (internal citations and quotation marks omitted).

In cases of conspiracy, as here, "deference to the jury's findings is especially important because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *Morgan*, 385 F.3d at 205 (quotation marks omitted); *see United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir.1992) (citation and internal quotation marks omitted). That said, the record must nonetheless permit a rational jury to find beyond a reasonable doubt: "(1) the existence of the conspiracy charged; (2) that the defendant had knowledge of the conspiracy; and (3) that the defendant intentionally joined the conspiracy." *Santos*, 541 F.3d at 70 (internal citations omitted). And in a conspiracy punishable under 21 U.S.C. § 841(b)(1)(A), the Government must also prove beyond a

reasonable doubt "(4) that it was either known or reasonably foreseeable to the defendant that the conspiracy involved the drug type and quantity charged." *Id.* at 70-71.

Rule 33 permits the Court to grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33; *see United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001). The Court has "broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992). Though a district court is entitled on a Rule 33 motion to "weigh the evidence and in so doing evaluate for itself the credibility of the witnesses, it must strike a balance between weighing the evidence and credibility of witnesses and not wholly usurping the role of the jury." *United States v. Triumph Capital Group, Inc.*, 544 F.3d 149, 159 (2d Cir. 2008) (internal citations and quotation marks omitted). Accordingly, the Court should exercise its discretion under Rule 33 with caution and sparingly and with due respect for the jury's verdict.

> The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice. The trial court must be satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict. The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation. There must be a real concern that an innocent person may have been convicted. Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances.

*Ferguson*, 246 F.3d at 134 (internal citations and quotation marks omitted).

## II.

The principal issue raised by Mr. Fisher is whether the record evidence was sufficient to support a finding beyond a reasonable doubt that he was a member of the drug conspiracy charged, rather than merely a simple buyer of drugs. This case proceeded to verdict before the Second Circuit

issued its decision in *United States v. Hawkins*, 547 F.3d 66 (2d Cir. 2008), though after its decision

in *United States v. Wexler*, 522 F.3d 194, 207 (2d Cir. 2008). Mr. Fisher's main defense to the

conspiracy charge at trial was that he was merely a buyer of drugs from Mr. Luis A. Colon and not

a member of Mr. Colon's drug trafficking organization. Accordingly, the Court gave a buyer-seller

charge to the jury that was influenced, in part, by the Second Circuit's opinion (and the concurring

and dissenting opinion of Judge Reena Raggi) in *Wexler*.

Therefore, during the course of the Court's charge on conspiracy, the Court instructed the

jury as follows:

> The second element, which the Government must prove beyond a reasonable doubt
> to establish the crime charged, is that Mr. Rojas and Mr. Fisher each knowingly,
> willfully and voluntarily became a member of the conspiracy under consideration.
> . . .
>
> I want to caution you, however, that a Defendant's mere presence at the scene of the
> alleged crime does not, by itself, make him a member of the conspiracy. Similarly,
> mere association with one or more members of the conspiracy does not make the
> Defendant a member. A person may know, associate with or be friendly with a
> criminal, without being a conspirator. Mere similarity of conduct or the fact that
> they may have assembled together or communicated does not necessarily establish
> proof of the existence of or membership in a conspiracy.
>
> I also want to caution you that mere knowledge or acquiescence, without
> participation, in the unlawful plan is not sufficient. Moreover, the fact that the acts
> of a Defendant, without knowledge, merely happen to further the purposes or
> objectives of the conspiracy, does not make that Defendant a member of the
> conspiracy. More is required under the law. What is necessary is that the Defendant
> must have participated with knowledge of at least some of the unlawful purposes or
> objectives of the conspiracy and with the intention of aiding in the accomplishment
> of those unlawful ends. *Thus without more, the mere existence of a buyer-seller
> relationship is insufficient to establish membership in a conspiracy. In deciding
> whether parties to a sale of narcotics are merely buyer and seller or instead are co-
> conspirators, the jury may properly consider a number of factors, including the
> length of time that the buyer affiliated with the seller, whether there was a common
> goal among the parties to advance the conspiracy's interests, whether there was an
> agreement or understanding to redistribute drugs, the established method of
> payment, the extent to which the transactions were standardized, the quantities of*

*drugs involved and whether there was a mutual trust between the buyer and seller. None of these factors is dispositive, nor is this listing intended to be exhaustive. In the end, the jury must determine whether on the basis of all of the evidence, the Government has proved beyond a reasonable doubt that the Defendant under consideration knowingly and willingly entered into an agreement or understanding with one or more persons to accomplish the goals of the charged conspiracy – namely, the distribution of the particular drugs charged.*

In sum, a Defendant, with an understanding of the unlawful character of the conspiracy, must have intentionally engaged, advised or assisted in it for the purpose of furthering the illegal undertaking. He thereby becomes a knowing and willing participant in the unlawful agreement that is to say, a conspirator.

(Emphasis added). As it turns out, the Court's charge appears to be fully consistent with the Second Circuit's decision in *Hawkins*. As a consequence, Mr. Fisher does not take issue with the Court's buyer-seller charge.

What Mr. Fisher does challenge is whether the evidence would permit a conclusion beyond a reasonable doubt that he conspired with Mr. Colon to possess with the intent to distribute, and to distribute, 500 grams or more of cocaine. To make that determination, the Court must consider the Second Circuit's recent decision in *Hawkins*, in which that court sought to set forth the considerations that are important in assessing whether a jury had a proper basis for concluding beyond a reasonable doubt that a defendant had crossed the line from being a mere buyer of drugs to becoming a member of a drug conspiracy. Warren Hawkins was convicted by a jury of conspiracy to possess with the intent to distribute, and to distribute, fifty grams or more of cocaine base, but his conviction was set aside by the district court on the ground that the evidence showed that Mr. Hawkins was not a member of the Luna drug conspiracy but only a mere buyer of drugs from Mr. Luna. *Hawkins*, 547 F.3d at 68-70.

The Second Circuit reversed the district court and reinstated the jury's verdict. *Id.* at 68. The

court began its analysis by explaining that a conspiracy requires proof that two or more persons agreed to participate in a "joint venture intended to commit an unlawful act," and that while a transfer of drugs from a seller to a buyer "necessarily involves agreement, however brief, on the distribution of a controlled substance," the "sale agreement itself cannot be the conspiracy to distribute, for it has no separate criminal object." *Hawkins*, 547 F.3d at 71 (quotation marks omitted); *see Wexler*, 522 F.3d at 208. Therefore, the Second Circuit emphasized, "[w]ithout more, the mere buyer-seller relationship is insufficient to establish conspiracy." *Hawkins*, 547 F.3d at 71; *accord United States v. Gore*, 154 F.3d 34, 40 (2d Cir. 1998); *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1191 (2d Cir. 1989). The court explained that the "'rationale for holding a buyer and a seller not to be conspirators is that in the typical buy-sell scenario, which involves a casual sale of small quantities of drugs, there is no evidence that the parties were aware of, or agreed to participate in a larger conspiracy.'" *Hawkins*, 547 F.3d at 72 (quoting *United States v. Medina* 944 F.2d 60, 65 (2d Cir. 1991)). And this is true even if the seller is aware that the buyer intends to resell the narcotics. *Id.* at 74 ("It is axiomatic that more is required than mere knowledge of the purpose of a conspiracy."). However, circumstantial evidence may support the jury in concluding beyond a reasonable doubt that the defendant took the "step from knowledge to intent and agreement, provided that the evidence of knowledge is clear, not equivocal." *Id*. (quotation marks omitted).

The question then is whether there is sufficient evidence to support an inference that a defendant agreed to participate in the conspiracy beyond simply buying or selling drugs, and when there is such evidence, the Second Circuit pointed out, it has upheld conspiracy convictions. *Id.* at

72-73 (discussing *United States v. Miranda-Ortiz*, 926 F.2d 172, 176 (2d Cir. 1991)).[2]  As the

Second Circuit explained, the "critical inquiry in each case is whether the evidence in its totality

suffices to permit a jury to find beyond a reasonable doubt that the defendant was not merely a buyer

or seller of narcotics, but rather that the defendant knowingly and intentionally participated in the

narcotics-distribution conspiracy by agreeing to accomplish its illegal objective beyond the mere

purchase or sale." *Id.* at 73-74.  While the court declined to provide an exhaustive list of factors to

guide what it termed "a highly fact-specific inquiry," the Second Circuit did identify several relevant

factors, including "'whether there was prolonged cooperation between the parties, a level of mutual

trust, standardized dealings, sales on credit ("fronting"), and the quantity of drugs involved.'"  *Id.*

at 74 (quoting *United States v. Hicks*, 368 F.3d 801, 805 (7th Cir. 2004) and *United States v. Gibbs*,

190 F.3d 188, 199 (3d Cir. 1999)).  The Second Circuit hastened to add, however, that "[n]o single

factor is dispositive" and that the "dispositive inquiry remains whether a rational jury could find

beyond a reasonable doubt that a defendant has agreed to join and participate in the conspiracy."

*Id.*

Turning to the evidence against Mr. Hawkins, the Second Circuit noted at the outset that the

parties did not dispute that the Government had adequately proved that the Luna conspiracy existed,

that Mr. Hawkins knew of the Luna conspiracy, that he purchased cocaine from Mr. Luna, that he

---

[2]  In *Miranda-Ortiz*, there was evidence that the defendant had twice offered to sell drugs to
an alleged coconspirator and that the two men had exchanged beeper numbers.  926 F.2d at 176.
The court in *Hawkins* pointed out that although the defendant in *Miranda-Ortiz* argued that this
evidence merely showed that the defendant was offering to supply the buyer for his personal use,
the court held that the exchange of beeper numbers permitted the jury to conclude that the buyer was
likely a distributor, rather than someone seeking drugs only for his personal use.  *Hawkins*, 547 F.3d
at 72-73.  According to the Second Circuit, other evidence, including the buyer's inability to obtain
cocaine for a repeat customer and his desire to acquire a kilogram of cocaine, also made the
defendant aware that the buyer was a distributor.  *Miranda-Ortiz*, 926 F.2d at 176.

intended to resell at least some of the purchased cocaine, and that Mr. Luna knew that. *Id.* The court found three factors supported the jury's finding beyond a reasonable doubt that Mr. Hawkins knowingly and intentionally joined the Luna drug conspiracy.

First, the tape recordings played at trial provided "direct proof of Hawkins's intent to redistribute the cocaine he purchased or sought to purchase from Luna and Luna's awareness of the same." *Id.* at 75; *see id.* at 76 ("The evidence in this case clearly demonstrates that Hawkins intended to redistribute cocaine and made this known to Luna."). The court reached this conclusion even though the quantities of cocaine at issue in the case were, as the court described them, "extremely small" – eight-balls, or 3.5 grams – and the fact that Mr. Hawkins was an addict who also personally used the drugs he acquired from Mr. Luna. *Id.* at 77 ("A large transaction or an accumulation of deals suggests more trust, garnered over a period of time, as well as a greater likelihood that the parties have 'put their heads together' to figure out planning, organization, and ways to conceal their activities." (quotation marks omitted)).

Second, the evidence showed that Mr. Hawkins was not just a "customer who happened to intend to redistribute cocaine independently," but rather a member of the Luna conspiracy. *Id.* at 76. The court reached this conclusion because of evidence that Mr. Hawkins had purchased from Mr. Luna four times in a two-week period, and therefore their relationship was, in the court's words, "more than a transient" one. *Id.* The court also noted that Mr. Hawkins contacted Mr. Luna twice when Mr. Hawkins had identified potential customers and that Mr. Hawkins had Mr. Luna's cell phone number "in order to contact Luna more readily in the future." *Id.*

The court acknowledged that a Luna associate had testified that Mr. Hawkins was neither a drug dealer generally nor a member of the Luna organization, but rather was a "go-between." *Id.*

at 77.  Although evidence that a defendant helped a willing buyer locate a willing seller would be insufficient to establish membership in a conspiracy, the Second Circuit stated that there was additional evidence in the case that would permit a jury reasonably to infer, not speculate, that Mr. Hawkins had agreed to carry out the objectives of the Luna conspiracy.  *Id.* at 77.  Furthermore, the jury was not required to accept the testimony of the Luna associate.  *Id.*  That their dealings were not standardized also did not undermine the jury's verdict.

> Hawkins, Luna, and [Luna's associate] discussed purchases, chatted about personal matters, and made arrangements to meet.  The extent of such interactions in this case does not seem out of the ordinary for any business venture, especially an illegal one.  We cannot say that any transaction costs borne by Hawkins and Luna were so high as to create a reasonable doubt where, as here, the jury was instructed that a mere buyer-seller relationship was insufficient and the evidence supports a finding that Hawkins was not only a customer but a knowing and willing participant in Luna's distribution of cocaine.

*Id.*

Third, and finally, the Second Circuit observed that there was evidence "reflecting mutual trust between Hawkins and Luna."  *Id*. at 76.  That evidence consisted of Mr. Hawkins telling Mr. Luna that he wanted to buy from Mr. Luna rather than other dealers, of Mr. Luna giving Mr. Hawkins his cell phone number, and of Mr. Luna's willingness to front drugs to Mr. Hawkins, though that credit transaction never actually took place.  *Id.*  The court reached this conclusion despite what it termed as the "absence of prolonged cooperation in this case."  *Id.*  As the court explained, "[t]here is no rule prohibiting a conspiracy conviction based on sufficient evidence that a defendant joined the conspiracy only shortly before the government dismantled it."  *Id.* at 76-77.

In sum, the Second Circuit concluded that "[a]lthough the scope of Hawkins's participation in the conspiracy might not have been especially significant, the evidence was sufficient to establish his intentional participation in the charged conspiracy beyond a reasonable doubt."  *Id.* at 78.

## III.

Turning to the evidence in this case, the Court acknowledges that this case presents a far closer question than was presented in the *Rojas* case. Nevertheless, the Court concludes that considering the totality of the evidence in the light of the decision in *Hawkins*, the jury had a proper basis on which to conclude beyond a reasonable doubt that Mr. Fisher was not merely a buyer or seller of narcotics, but rather that he knowingly and intentionally participated with Mr. Colon in the narcotics-distribution conspiracy charged in the Superseding Indictment.

At the outset, it is important to emphasize that the Government has never argued that Mr. Fisher joined the Colon drug trafficking organization of which Mr. Rojas was a member. Rather, the Government argues that Mr. Fisher conspired with Mr. Colon in a stand-alone conspiracy to possess cocaine for the purpose of distributing it. Mr. Fisher responds that at the very most, the evidence showed that he purchased drugs from Mr. Colon and that in effect, they were two independent contractors who occasionally did business with one another.[3]

There is certainly some evidence that supports Mr. Fisher's theory of the case. First, Mr. Colon testified that he did not consider Mr. Fisher his partner and that he was not a member of the Colon drug trafficking organization. Mr. Colon also testified that after selling Mr. Fisher drugs, the two "went their separate ways" and that he, Mr. Colon, did not care what Mr. Fisher did with the drugs. Also, there was no evidence that Mr. Colon knew the identity of the individuals to whom Mr. Fisher was selling drugs and no evidence that Mr. Fisher knew who else was a customer of Mr.

---

[3] Mr. Fisher has always disputed that he was the one who was captured on wiretapped phone calls that were played to the jury. However, the Court concludes that the jury had a proper basis for concluding that Mr. Fisher was, in fact, the individual on the wiretapped phone calls. First, Mr. Colon testified that it was Mr. Fisher on the calls. Second, the name "Fruit" comes up in the calls, and Officer Binette identified Mr. Fisher as someone whose street name was "Fruit."

Colon. Finally, the evidence showed only three sales between Mr. Colon and Mr. Fisher, all of which were for cash. As a consequence, Mr. Fisher argues that neither Mr. Colon nor Mr. Fisher had a stake in each other's business.

From this evidence, the jury might have concluded that Mr. Fisher and Mr. Colon were merely buyers and sellers, not conspirators. But the jury was not compelled to reach that conclusion because it also received evidence supporting a conclusion that while Mr. Colon and Mr. Fisher may have begun their relationship as mere buyer and seller, their relationship grew into a drug distribution joint venture over time. Therefore, the jury – which was expressly instructed that a mere buyer-seller relationship was insufficient – had ample evidence to conclude beyond a reasonable doubt that Mr. Colon and Mr. Fisher conspired to distribute drugs. That evidence consisted of the following.

First, the relationship between Mr. Fisher and Mr. Colon was over a year in the making, not just the two weeks involved in *Hawkins*. They each knew that the other was involved in trafficking cocaine, and the quantities involved – either 400 or 500 grams of cocaine at a time – were clearly not for personal use but were intended for redistribution. While it is true that they did not know the specific identity of each other's customers, they often spoke to each other about their customers. For example, Mr. Fisher said that his customers liked the quality of Mr. Colon's cocaine. And on one occasion when Mr. Colon met with Mr. Fisher to deliver 500 grams of cocaine, Mr. Fisher briefly left Mr. Colon with the drugs after taking 50 grams of cocaine to deliver to a customer. On that same occasion, Mr. Colon waited while Mr. Fisher weighed out the drugs and helped Mr. Fisher bag the cocaine into smaller, distribution quantities in ziplock bags. As the Second Circuit observed in *Hawkins*, "[a] large transaction or an accumulation of deals suggests more trust, garnered over a

period of time, as well as a greater likelihood that the parties have 'put their heads together' to figure out planning, organization, and ways to conceal their activities."   547 F.3d at 77 (quotation marks omitted).

Second, their relationship was far more than "transient"; and it was not sporadic, as Mr. Fisher wishes to characterize it.  Mr. Colon and Mr. Fisher communicated frequently and each had the other's cell phone number.  They discussed meeting places, difficulties with supply, price points, potential customers, problems in their drug business, and travel plans.  In their conversations, they also discussed the fact that Mr. Fisher had other suppliers but that he wanted to buy from Mr. Colon because he preferred the quality of Mr. Colon's product, which was popular with Mr. Fisher's customers.  The frequency of their calls also increased as they became more comfortable with each other in the period of June through September 2006.

While only three deals were actually consummated (though the quantities involved were quite large), Mr. Fisher and Mr. Colon discussed many more potential transactions that did not occur for a variety of reasons that do not undermine their demonstrated desire to work together.  Also, the quantities involved in their transactions were standardized – 400 or 500 grams of cocaine at a time. *See Wexler*, 522 F.3d at 211 (Raggi, J., concurring in part and dissenting in part); *Hicks*, 368 F.3d at 805.  Thus, at one point, Mr. Colon asks Mr. Fisher how much cocaine he wants, to which Mr. Fisher responds, "You know."  Mr. Colon then says, "one-half," meaning one-half a kilogram, their standard quantity.

Third, there was a level of mutual trust between Mr. Fisher and Mr. Colon, which is apparent from their conversations.  In a conversation on July 27, 2006, Mr. Colon even offered to provide Mr. Fisher with 500 grams of cocaine on credit.  While that particular transaction did not occur, that was

12

true in *Hawkins* as well. There, the Second Circuit noted, "Luna's expressed willingness to provide Hawkins with approximately $100 worth of cocaine on credit reflects trust in Hawkins and a stake in his redistribution." *Id.* at 76; *see United States v. Gibbs*, 190 F.3d 188, 200 (3d Cir. 1999) ("A credit relationship may well reflect [mutual trust], and often evidences the parties' mutual stake in each other's transactions."). Here, Mr. Colon was willing to front Mr. Fisher far more than $100 of cocaine. And Mr. Fisher made it clear to Mr. Colon that he could sell the cocaine in a matter of days, thus assuring Mr. Colon that he would obtain a quick return on his investment. *See United States v. Dortch*, 5 F.3d 1056, 1065 (7th Cir. 1993) ("'fronting' suggests the existence of a conspiracy because it appears both that the seller has a stake in the success of the buyer's activities and that a degree of cooperation and trust exists beyond that which results from a series of isolated and sporadic transactions.").

Furthermore, while Mr. Fisher may not have been a part of Mr. Colon's drug trafficking organization, the record shows that he asked Mr. Colon to become a member of the Colon "team." And when Mr. Fisher ordered drugs, they met together at locations used by Mr. Fisher, and Mr. Colon delivered the drugs personally. The jury could well have concluded that Mr. Colon would not have walked into Mr. Fisher's stash locations carrying large quantities of drugs unless there was a fair degree of trust between these two men. Indeed, on one occasion Mr. Colon even invited Mr. Fisher to join him on a trip to Puerto Rico. Also, when Mr. Fisher was shot at while driving in Mr. Colon's neighborhood, Mr. Colon was quick to call Mr. Fisher to assure him that he did not have anything to do with the shooting and to calm Mr. Fisher down in order to protect their business relationship. Finally, when Mr. Colon's supplier offered lower quality cocaine to supply Mr. Fisher's needs, Mr. Colon declined the offer, not wanting to disappoint Mr. Fisher or damage their

13

relationship in any way.

Fourth, the evidence presented would permit the jury to conclude that each man had his own reasons for wanting to join together in this drug distribution operation. For Mr. Colon, Mr. Fisher represented someone who would take large quantities of cocaine for redistribution. Mr. Fisher thus gave Mr. Colon an outlet for large quantities of cocaine. And for Mr. Fisher, Mr. Colon was a supplier of high quality cocaine that he could not obtain from his other suppliers. Each, therefore, had his own reasons for wanting to join together to distribute large quantities of high quality cocaine. The relationship was thus mutually beneficial and mutually dependent.

In many ways, therefore, the evidence presented in this case is far stronger than in *Hawkins*. And unlike *Gore* or *Wexler*, there was evidence from which a jury could find beyond a reasonable doubt that there was an agreement and an understanding between Mr. Colon and Mr. Fisher for the sale and redistribution of cocaine – in short, a conspiracy to distribute cocaine. For these reasons, a judgment of acquittal is not warranted. Nor does the Court believe that the jury's verdict represents a miscarriage of justice such that a new trial would be appropriate.[4]

## IV.

Mr. Fisher makes several other arguments that will not long detain the Court. First, he contends in a single paragraph that the evidence was insufficient to support a conviction for possession with the intent to distribute 500 grams or more of cocaine. The gist of Mr. Fisher's argument is that his conviction on this charge is wholly dependent on the testimony of Mr. Colon,

---

[4] Mr. Fisher also makes reference to the Second Circuit's decision in *United States v. Huezo*, 546 F.3d 174 (2d Cir. 2008). In *Huezo*, the Court disapproved of a jury charge that once a conspiracy is shown to exist, only "slight evidence" is needed to link another defendant with it. *Id.* at 180 n.2. Here, however, the Court did not give such a charge; nor did the Government advance such an argument in its closing arguments.

14

which was not corroborated.

The Court disagrees that Mr. Colon's testimony was uncorroborated. The wiretapped telephone calls corroborated much of Mr. Colon's testimony. In particular, on June 29, 2006, Mr. Fisher ordered 500 grams of cocaine from Mr. Colon, which he delivered to Mr. Fisher at a location on Bishop Street in Waterbury. Phone calls document the transaction and also show that Mr. Colon was at the Bishop Street location with Mr. Fisher for some time. Indeed, Mr. Fisher's voice is heard in the background of a call between Mr. Colon and his wife from the Bishop Street location. Officer Binette also confirmed Mr. Colon's testimony that Mr. Fisher used the street name "Fruit," a name that appears often on the wiretapped calls. *See, e.g., United States v. Florez*, 447 F.3d 145, 155 (2d Cir. 2006) (testimony of a single accomplice is sufficient to sustain a conviction so long as the "testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt"); *United States v. Parker*, 903 F.2d 91, 97 (2d Cir. 1990) (same). In sum, the evidence regarding the June 29, 2006 transaction satisfied all of the elements of the crime of possession with intent to distribute 500 grams or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B).

Second, Mr. Fisher contests the telephone count because, as he puts it, the evidence is insufficient to support the substantive counts of conspiracy and distribution. Having concluded that the evidence was sufficient to support the substantive offenses and having also concluded that the jury was justified in concluding that Mr. Fisher was the individual on the telephone ordering drugs from Mr. Colon, the Court has little difficulty concluding that there was ample evidence to support the jury's verdict convicting Mr. Fisher of use of a telephone to facilitate a drug trafficking felony in violation of 21 U.S.C. § 843(b).

Third and finally, Mr. Fisher contends that he was prejudiced by Officer Binette's testimony that he knew of Mr. Fisher from a prior arrest, and therefore, a new trial is required. As Mr. Fisher recognizes, the Court ruled before trial that Officer Binette should not mention the fact that he knew of Mr. Fisher from a prior arrest. Despite the efforts of the Court and counsel, Officer Binette failed to follow directions, though the Court does not find that his lapse represented intentional misconduct by either Government counsel or Officer Binette. Thus, the testimony from Officer Binette in response to questions from Government counsel was as follows:

> Q.      Okay. And so when did you first learn that this individual [Mr. Fisher] goes by the name Fruit?
>
> A.      From that time – I had actually an arrest in 2004.
>
> MR. RICCIO:      Your Honor, I move to strike that.

In response, and without any request for a cautionary instruction, the Court informed the jury as follows:

> THE COURT:      Ladies and gentlemen of the jury, I'm going to strike that answer. I direct you to ignore that answer.
>
>                 The question, and I know this is tough, officer, but you have to focus on the question. The question was when.
>
> THE WITNESS:      When was it?
>
> THE COURT:      Not whether or why; it was when, okay? So focus on the question, answer it.
>
>                 Ladies and gentlemen of the jury, again, you must ignore that answer. I have stricken it from the record and it should play no part whatsoever in your deliberations, you should not even discuss it. Understood?
>
>                 Go ahead.

In its final instructions to the jury, the Court also cautioned them that testimony that the Court had

16

excluded, stricken, or told the jury to disregard was not evidence, and must be disregarded by the jury.

While Officer Binette's testimony was unfortunate, the Court concludes that it was not intentional and that any prejudice to Mr. Fisher was adequately cured by the Court's prompt cautionary instruction. *See United States v. Mussaleen*, 35 F.3d 692, 694-95 (2d Cir. 1994) (witness' and officer's nonresponsive remarks harmless error given the strength of the government's case and the court's issuance of appropriate curative instructions); *United States v. Castano*, 999 F.2d 615, 618 (2d Cir. 1993) (inadvertent introduction of improper evidence harmless error where portion of the record stricken and jury instructed to disregard it). The assumption is that "a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant." *See Mussaleen*, 35 F.3d at 695 (quoting *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987)) (internal citations omitted). Notably, Officer Binette did not mention the crime for which he arrested Mr. Fisher. And Mr. Fisher's counsel did not ask for any further cautionary instructions beyond those the Court gave *sua sponte*. In these circumstances, the Court does not believe a new trial is required. *See Mussaleen*, 35 F.3d at 695 ("Even if the evidence against [the defendant] had been less strong, neither comment is so 'devastating' as to overcome the assumption that the jury will follow the court's instructions.").

## V.

The Court DENIES Defendant Gwayne Fisher's Rule 29(c) Motion for Judgment of Acquittal and Rule 33 Motion for a New Trial [doc. # # 206, 207].

IT IS SO ORDERED,


/s/    Mark R. Kravitz
United States District Judge


**Dated at New Haven, Connecticut: December 19, 2008.**